IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **REBEKAH RUSHIN,** : | |
| **Plaintiff** : | **CIVIL No. 1:13-CV-02113** |
| : | |
| v. : | |
| : | |
| **CAROLYN W. COLVIN,** : | |
| **Acting Commissioner of Social** : | |
| **Security,** : | |
| : | **Judge Sylvia H. Rambo** |
| **Defendant** : | |

# **M E M O R A N D U M**

In this appeal from a decision of the Commissioner of Social Security denying Disability Insurance Benefits, Plaintiff claims the administrative decision concluding that she is not disabled as defined by the Social Security Act is not supported by substantial evidence. For the following reasons, the court will affirm the decision of the Commissioner.

**I.      Background**

      **A.      Procedural History**

On September 3, 2010, Plaintiff Rebekah Rushin ("Plaintiff") protectively filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), under Titles II and XVI of the Social Security Act, claiming that she suffers from a disability that began on August 31, 2009. (*See* Doc. 10-5, pp. 2-3 of 20.) The Social Security Administration initially denied Plaintiff's application by decision dated March 2, 2011. (Doc. 10-4, pp. 2-10 of 33.) On March 25, 2011, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (*Id*. at p. 12 of 33.) ALJ Sridhar Boini held a hearing on January 11, 2012, at which Plaintiff and vocational expert Michele Georgio testified.

(Doc. 10-2, pp. 23-43 of 81.) ALJ Boini issued an unfavorable decision to Plaintiff on April 9, 2012 (*id.* at p. 7 of 81), and Plaintiff filed an appeal with the Appeals Council on May 3, 2012 (*id.* at p. 5 of 81). The Appeals Council denied Plaintiff's request on June 18, 2013 (*id.* at pp. 1-4 of 81), and Plaintiff commenced the instant action on August 9, 2013 (Doc. 1).

### B. Evidence of Record

Plaintiff was 22 years old and considered a "younger individual"[1] under the Act at the time of the alleged onset date of her disability. (*See* Doc. 10-5, p. 2 of 20.) She has a high school education and prior relevant work experience as a cashier. She lives with her mother and father. (Doc. 10-2, p. 36 of 81.)

On April 10, 2007, Plaintiff was involved in a motor vehicle accident and was treated at the Pocono Medical Center for severe back pain. (Doc. 10-7, pp. 5-6 of 19.) Radiological exams taken one week after the accident revealed that she suffered a lumbar spine fracture. (Doc. 10-7, pp. 13-14 of 19.)

On January 27, 2009, Plaintiff sought treatment at Coordinated Health Services ("CHS"), where she was seen by physiatrist Dr. Steven Mazza, M.D.[2] Dr. Mazza's examination revealed a right-side antalgic gait and limited lumbar range of motion. (Doc. 10-8, p. 35 of 49.) Plaintiff had 5/5 strength in all major muscle groups and in the lower extremities bilaterally. (*Id.*) However, her sensation was

---

[1] The Social Security regulations use the term "younger individual" to denote an individual aged 18 through 49 years. *See* 20 C.F.R. § 404.1563(c).

[2] It is unclear from the record what treatment, if any, Plaintiff received for the nearly two years following her accident as there are no medical records between January 27, 2009 and April 18, 2010. (*See* Docs. 10-7 & 10-8.) However, treatment notes from Plaintiff's initial appointment with Dr. Mazza on January 27, 2009, indicate that Plaintiff "had [pursued] multiple treatment options including extensive physical therapy and medical routines over the past [three] years without significant benefit." (Doc. 10-8, p. 35 of 49.)

diminished in an L5-S1 distribution on the right.  (*Id.*)  Dr. Mazza reviewed an MRI of Plaintiff's lumbar spine, which demonstrated a central annular fissure at L3-4 with a central disk protrusion and lateral recess stenosis at L4-5, and a left paracentral disk herniation/protrusion with lateral recess and neuroforaminal stenosis at L5-S1.  (*Id.*)  Electrodiagnostic studies were normal with some elevation of the L5-S1 nerve roots.  (*Id.*)

During examinations conducted by Dr. Mazza in early 2010, Plaintiff continued to exhibit limited lumbar range of motion and a right-sided gait.  (Doc. 10-8, pp. 21, 26, 31, 43 of 49.)  Plaintiff's primary complaint concerned low back pain with extension into her right leg.  (*Id.*)  In an effort to treat her pain, Plaintiff received several epidural injections into her spine and an L3-4-5 medial branch block with minimal relief.  (Doc. 10-9, pp. 7-12 of 77; *see* Doc. 10-8, pp. 26-27 of 49.)

On April 16, 2010, Plaintiff received a repeat MRI, which revealed multilevel spondylotic changes throughout the lumbar spine, a broad-based disc herniation at L3-4, and an anterior wedge deformity/fracture involving the L1 vertabrae.  (Doc. 10-8, pp. 47-49 of 49.)

At an appointment with Dr. Mazza on May 13, 2010, Plaintiff continued to complain of low back pain extending into the right leg and rated her pain as a 9 out of 10.  (*Id.* at pp. 16-17 of 49.)  Upon examination, Plaintiff was in no acute distress and her lower extremity strength and sensations were grossly intact bilaterally.  (*Id.* at p. 17 of 49.)  However, she walked with a right-sided gait and had limited lumbar range of motion.  (*Id.*)  Dr. Mazza referred Plaintiff to a neurosurgeon and directed her to continue with pain medication.  (*Id.*)

Plaintiff's subsequent examinations with Dr. Mazza in June and July 2010, revealed the same objective findings as prior examinations. (*Id.* at pp. 5-13 of 49.) Dr. Mazza's treatment notes reflected that Plaintiff was considering surgery due to her continued, severe lower back pain and functional limitations that were not improving with conservative and interventional care. (*Id.*) An EMG and nerve conduction velocity study conducted on July 30, 2010, provided normal findings. (*Id.* at pp. 5-7.)

Plaintiff underwent a right-sided L4-5 and L5-S1 microdiskectomy on September 27, 2010, performed by Dr. Chris Lycette, M.D. (Doc. 10-9, pp. 63-64 of 77.) At her post-operative consultation on October 18, 2010, Plaintiff reported feeling better than she did pre-operatively, but noted that she continued to have "some right leg pains at times and some numbness/tingling along the right calf and foot." (Doc. 10-12, p. 33 of 98.) Dr. Lycette instructed her to start physical therapy and to follow up with him in six weeks. (*Id.* at p. 34 of 98.)

On January 31, 2011, Dr. Linda Blouse, M.D. performed a consultative examination of Plaintiff at the request of the Social Security Administration. Plaintiff complained of increasing low back pain with radiation into her right leg since the time of her accident in 2007. (Doc. 10-12, p. 38 of 98.) She reported that she had undergone a laminectomy, but experienced no significant relief of her pain. (*Id.*) She described the pain as continuous but worsening with activity. (*Id.*) She tried to discontinue narcotics after suffering a seizure, but the pain was so severe that she had to continue the pain medication. (*Id.*) Plaintiff expressed difficulty with lifting and carrying more than a gallon of milk and with sitting and standing for more than ten minutes. (*Id.* at p. 39 of 98.) Upon examination, Dr. Blouse observed that

Plaintiff had decreased range of motion of the lumbar spine and a positive straight leg raise test on the right. (*Id.* at p. 40 of 98.) Her deep tendon reflexes and strength were equal bilaterally. (*Id.*) Following her examination, Dr. Blouse completed a residual functional capacity assessment, wherein she indicated that Plaintiff could frequently lift and carry 2-3 pounds and occasionally lift and carry ten pounds. (*Id.* at p. 43 of 98.) She further opined that Plaintiff could not sit for more than one hour cumulatively in an eight hour work day and could stand for less than one hour cumulatively in an eight hour work day. (*Id.*)

On March 1, 2011, Dr. Elizabeth Kamenar, a consulting physician for the State Agency, completed a physical RFC assessment for Plaintiff. (Doc. 10-12, pp. 70-76 of 98.) Dr. Kamenar opined that Plaintiff would be capable of doing a range of light work, but with occasional postural limitations and environmental limitations. (*Id.*)

On March 21, 2011, Plaintiff returned to Dr. Lycette and reported that she had experienced overall improvement in her back and leg pain with the pain now located mainly along the side of the thigh to the shin. (Doc. 10-12, p. 96 of 98.) She was working to wean herself off pain medications. (*Id.*) Upon examination, Dr. Lycette observed that Plaintiff was not in acute distress and had a normal gait. (*Id.* at p. 97 of 98.) She had normal strength in her upper and lower extremities and no evidence of sensory loss. (*Id.*) Dr. Lycette opined that she had recuperated "well" from her surgery and was ready to start physical therapy. (*Id.*)

### C. <u>Hearing Testimony</u>

At the administrative hearing, Plaintiff testified that she had experienced continuous pain in her back and right leg since the time of her accident and that her

"surgery didn't help." (Doc. 10-2, p. 28 of 81.) Although Dr. Lycette recommended an additional surgery to address the ongoing pain, Plaintiff was reluctant to move forward because she had previously dealt with addiction to pain killers and a seizure disorder from Tramadol. (*Id.* at pp. 28-32 of 81.) As a result, she had stopped taking all pain medication and was only taking Methadone. (*Id.* at p. 30-33 of 81.) She went to physical therapy following the surgery, but stopped going when she began treatment for her pain medication addiction. (*Id.* at p. 33 of 81.)

Plaintiff further testified that she had difficulty sitting, standing, and walking. (*Id.* at p. 34 of 81.) After sitting for approximately fifteen minutes, her pain would become unbearable. (*Id.*) Her tolerance for standing and walking was also limited to about fifteen minutes. (*Id.* at pp. 34-35.) She described her typical day as being confined to her room where she lays in bed. (*Id.* at p. 36.) Her parents did the household chores and assisted with her other needs. (*Id.*) She could not go shopping or "do anything" because of the pain. (*Id.* at p. 37 of 81.) She also had trouble sleeping because she constantly needed to move around to alleviate her pain. (*Id.*)

Plaintiff testified that she was 5'5" and weighed 195 pounds. (*Id.* at p. 39 of 81.) She attributed her weight gain to her inactivity resulting from her back issues. (*Id.*) Although her doctors had recommended weight reduction to reduce her back pain, she thought "that [weight loss] would be difficult for [her] because of the movement [required]." (*Id.*)

Plaintiff testified that she would be incapable of sustaining an eight-hour work day. (*Id.* at p. 38 of 81.)

Following Plaintiff's testimony, Michele Georgio, a vocational expert, testified that Plaintiff is 24 years old and had twelve years of education and prior work experience in light duty, semi-skilled jobs in security, as a cashier, and as a retail clerk. (*Id.* at p. 40 of 81.) The ALJ posed the following hypothetical to Ms. Georgio:

> [A]ssume an individual of the same age, educational level, and work history as the claimant here today, who would have the maximum residual functional capacity to engage in a range of sedentary level work lifting and carrying 5 pounds frequently, and 10 pounds occasionally. The individual would be able to otherwise meet the requirements for sitting, standing, and walking for sedentary level work. However, the individual should not be required to ascend ladders, scaffolds, or ropes except in case of emergencies, but ramps or stairs only occasionally. The individual should not be required to bend to the floor on any more than an occasional basis, and bending below the knees likewise occasionally. The individual could not stoop or crouch any more than occasionally. Kneeling or crawling would be relegated to emergent circumstances. The individual would not have any diminution in the use of the upper extremities for handling, fingering, feeling, grasping, or reaching in all directions, but the individual could not operate foot controls. Due to some issues from a neurological standpoint, the individual should not work at unprotected heights, or around dangerous moving machinery, and should not be exposed to the temperature extremes of extreme heat or cold. And because of pain being a limiting factor, the individual can perform work at a moderate production pace but not a high volume, and high intensity strict quota system work pace. What kind of occupations might fit that hypothetical?

(*Id.* at pp. 40-41 of 81.) Based on the hypothetical, Ms. Georgio provided the following testimony regarding available occupations in Pennsylvania for the hypothetical individual:

> She could work under the classification of semi-skilled sedentary cashiers. There are 32,465 jobs in the Commonwealth. She could work under reception and information clerks, semi-skilled and sedentary. There are

> 25,851 jobs in the Commonwealth, or she could work under the classification of interview clerk. There are 3,653 semi-skilled sedentary jobs.

(*Id.* at p. 41 of 81.) Ms. Georgio testified that the inclusion of a self-directed sit/stand option would not impact her response. (*Id.*) The ALJ then added to his hypothetical the limitations that the individual "would fall off task with regularity, and would require frequent unscheduled breaks, and incur partial or whole day absenteeism, and diminution of work efficiency as a result of the difficulties that the individual is facing." (*Id.* at p. 42 of 81.) Based on these additional limitations, Ms. Georgio testified that the individual would be unemployable. (*Id.*)

## II. Standard of Review

A district court's review of the Commissioner's decision is quite limited. *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). The scope of review by this court is restricted to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Findings of fact by the Commissioner are considered conclusive provided they are supported by "substantial evidence," a standard that has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003) (quoting *Richardson*, 402 U.S. at 401). "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).

This court does not undertake a *de novo* review of the decision and does not re-weigh evidence presented to the Commissioner. *Schoengarth v. Barnhart*, 416 F. Supp. 2d 260, 265 (D. Del. 2006) (citing *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). The substantial evidence standard is differential, including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence. *See id*. If the decision is supported by substantial evidence, the reviewing court must affirm the decision, even if the record contains evidence which would support a contrary conclusion, *Panetis v. Barnhart*, 95 F. App'x 454, 455 (3d Cir. 2004), or if the court itself "would have decided the factual inquiry differently," *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).

**III.    Discussion**

In his decision, the ALJ determined that Plaintiff was not disabled because she could perform work that existed in significant numbers in the national economy. (Doc. 10-2, pp. 18-19 of 81.) Plaintiff contends that the evidence of record does not support the ALJ's decision. (Doc. 11, p. 8 of 12.) Specifically, Plaintiff claims that the ALJ erred in assessing her residual functional capacity ("RFC"). (*Id.* at pp. 9-10 of 12.)

**A.    Administrative Framework**

In determining whether a claimant is eligible to receive disability insurance benefits, the burden is on the claimant to show that she has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe she is unable to pursue substantial gainful employment[3] currently

---

[3] According to 20 C.F.R. 416.972, substantial employment is defined as "work activity that involves doing significant physical or mental activities." "Gainful work activity" is the type of work
(continued...)

existing in the national economy.  Applicable to Plaintiff, a "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months."  42 U.S.C. § 423(d)(1)(A); *Ramirez v. Barnhart*, 372 F.3d 546, 550 (3d Cir. 2004).

To determine whether a claimant is disabled, the ALJ conducts a formal five-step evaluation process:

> (1) if the claimant is working or doing substantial gainful activity, he cannot be considered disabled;
>
> (2) if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits his ability to do basic work activity, he is not disabled;
>
> (3) if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;
>
> (4) if the claimant retains sufficient residual functional capacity ("RFC")[4] to perform his past relevant work, he is not disabled; and
>
> (5) if, taking into account the claimant's RFC, age, education, and past work experience, the claimant can

---

[3] (...continued)
usually done for pay or profit.

[4] Briefly stated, RFC is the most a claimant can do despite his recognized limitations. Social Security Ruling 96-9p defines RFC as "the individual's maximum remaining ability to perform work on a regular and continuing basis, *i.e.,* 8 hours a day, for 5 days a week, or an equivalent work schedule.

>perform other work that exists in the local, regional, or
>national economy, he is not disabled.

See 20 C.F.R. § 416.920(a)(4); *see also Morales v. Apfel*, 225 F.3d 310, 316 (3d Cir. 2000). The claimant bears the burden of proof for steps one through four of this test. *Sykes v. Apfel*, 228 F.3d 259, 263 (3d Cir. 2000); *see Crostly v. Astrue*, Civ. No. 10-cv-0088, 2011 WL 5026341, *2 (W.D. Pa. Oct. 21, 2011). The Commissioner bears the burden of proof for the last step to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy. *Id.* (citing *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987)).

### B. ALJ's Decision

Following this sequential analysis, the ALJ first concluded that Plaintiff has not engaged in substantial gainful activity since August 31, 2009, the alleged onset date of her disability. (Doc. 10-2, p. 12 of 81.) At step two, the ALJ found that Plaintiff suffered from degenerative disc disease of the lumbar spine, and noted that "[t]his impairment has more than a slight impact on the claimant's ability to perform some work-related activities and is, therefore, considered to be severe." (*Id.*) In resolving step three, the ALJ concluded that Plaintiff's impairment did not satisfy the criteria of any relevant listing. (*Id.* at p. 13 of 81.) The ALJ considered Listing 1.04, which pertains to musculoskeletal impairments, but found, *inter alia*, that Plaintiff did not have the requisite neurological deficits. (*Id.*)

At step four, the ALJ concluded that Plaintiff had the residual functional capacity to perform a range of sedentary work as defined in 20 CFR §§ 404.1567(a) and 416.967(a).[4] (*Id.*) While the ALJ found that Plaintiff's

---

[4] The ALJ included the following limitations in the RFC:

(continued...)

degenerative disc disease of the lumbar spine was severe insofar as it limits her to a range of sedentary work, he determined it was not so severe as to be completely disabling. (*Id.* at p. 14 of 81.) In making this finding, the ALJ acknowledged that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms were not credible to the extent they were inconsistent with her RFC. (*Id.* at p. 15 of 81.)

Specifically, the ALJ observed that the objective signs and findings on physical examination were not particularly adverse:

> While [an MRI] of the lumbar spine in April 2010 revealed degenerative disc disease of the lumbar spine at L4-5 and L5-S1, with impression upon the thecal sac, this was addressed by microdiscectomies at both levels, performed on September 27, 2010. Prior to her surgery, [Plaintiff] walked with an antalgic gait and she had complaints of radiculopathy. However, [EMG] and nerve conduction velocity (NCV) studies failed to confirm anything, and

---

[4] (...continued)
[Plaintiff] could life 5 pounds frequently and 10 pounds occasionally. [Plaintiff] would otherwise be able to meet the requirements for sitting, standing, and walking for sedentary work. However, [Plaintiff] should not be required to ascend ladders, scaffolds, or ropes, except in case of emergencies, but ramps or stairs occasionally. [Plaintiff] should not be required to bend to the floor on any more than an occasional basis, bending below the knees, likewise, occasionally. [Plaintiff] could not stoop or crouch any more than occasionally, kneeling or crawling would be relegated to emergent circumstances. [Plaintiff] would not have any diminution of the use of the upper extremities, for handling, fingering, grasping, or reaching in all directions, but [Plaintiff] could not operate foot controls. Due to some issues from a neurological standpoint, [Plaintiff] should not work at unprotected heights or on dangerous moving machinery, and should not be exposed to temperatures of . . . extreme heat or cold. In addition, because of pain being a limiting factor, [Plaintiff] could perform work at a moderate production pace, not a high volume, high intensity, strict quota system work pace.

(Doc. 10-2, pp. 13-14 of 81.)

> such testing was essentially normal. [Plaintiff] did not even have any sensory deficits upon examination.

(*Id.* (internal citations omitted).) The ALJ also found that the record indicated that Plaintiff's condition improved following surgery. (*Id.*) At her initial post-operative consultation, Plaintiff reported feeling better and only complained of sensory issues along her right calf and foot, in addition to some leg pain. (*Id.*) At her subsequent follow up on March 21, 2011, she reported that she had overall improvement in her back and leg pain. (*Id.*) Her examination revealed normal strength in both the upper and lower extremities and no evidence of sensory loss. (*Id.*) The ALJ further noted that her cessation of pain medication indicated that her symptoms were "far less extreme than she subjectively report[ed]." (*Id.* at p. 17 of 81.)

        The ALJ determined that the RFC completed by Dr. Blouse pursuant to an examination conducted post-surgery was not entitled to great weight because, both before and after the examination, Plaintiff had reported amelioration of symptoms to her treating sources. (*Id.* at p. 16 of 81.) Moreover, the examiner's report did not relate significant gait or station issues, ambulation deficits, or transfer problems, yet the examiner opined that Plaintiff had significant limitations in lifting, sitting, standing, and walking. (*Id.*) The ALJ noted that the only abnormalities upon examination were a positive straight leg raise test on the right and some decreased range of motion of the lumbar spine, which were not significant enough to warrant such severe limitations. (*Id.*) In addition, the examiner's findings were inconsistent with those of the neurosurgeon, who related greatly improved symptoms post surgery. (*Id.*)

        The ALJ also considered the RFC completed by Dr. Kamenar, the consulting physician for the State Agency, but found that the objective medical

evidence of record established that Plaintiff would be limited to sedentary work, rather than light work as Dr. Kamenar had opined. (*Id*.)

Finally, at step five, the ALJ determined that, based on the testimony of the vocational expert, Plaintiff could perform sedentary jobs that exists in significant numbers in the national economy. (*Id.* at p. 19 of 81.) As a result of the five-step sequential evaluation process, the ALJ concluded that Plaintiff has not been disabled as defined by the Social Security Act since August 31, 2009. (*Id.* at p. 10 of 81.)

### C. Plaintiff's Appeal

Plaintiff contends that the ALJ's RFC assessment lacks the support of substantial evidence. (Doc. 11, p. 8 of 12.) Specifically, Plaintiff argues that the objective medical evidence supports her subjective complaints and that the ALJ failed to give sufficient weight to the opinion of the impartial consultative examiner. (*Id*. at pp. 8-10 of 12.) After a thorough review of the administrative record, the court finds that the ALJ properly concluded that, although Plaintiff had severe impairments, she retained the residual functional capacity to perform work at the sedentary level.

Pursuant to regulations promulgated by the Commissioner, "[a]llegations of . . . subjective symptoms must be supported by objective medical evidence." *Hartranft*, 181 F.3d at 362 (citing 20 C.F.R. § 404.1529). If the ALJ concludes a medical impairment that could reasonably cause the alleged symptoms exists, the ALJ must then attempt to ascertain and evaluate the severity of the claimant's subjective symptoms as well as the degree to which it may limit the claimant's ability to perform various types of work. *Id.*; *Scatorchia v. Commissioner of Soc. Sec.*, 137 F. App'x 468, 471 (3d Cir. 2005).

Instantly, in evaluating Plaintiff's claims, the ALJ appropriately considered Plaintiff's degenerative disc disease, her resultant back and leg pain, and the limiting effects on Plaintiff. As the ALJ noted, the objective medical evidence and findings upon physical examination were not particularly adverse. Although MRIs of Plaintiff's lumbar spine conclusively documented degenerative disc disease, disc herniations, and stenosis, EMG and nerve conduction studies were essentially normal. Likewise, although pre-surgical examinations routinely revealed that Plaintiff had limited lumbar range of motion, right-sided gait, mildly positive straight leg tests, and tenderness and mild spasms to palpitations on her lumbar, Dr. Mazza also observed that she maintained equal strength bilaterally in her lower extremities and did not note any sensory deficits. To the extent Plaintiff's degenerative disc disease was manifesting itself in physical symptoms, these issues were addressed by her microdiscectomy.

Indeed, at her post-surgical appointment with Dr. Lycette on October 18, 2010, Plaintiff indicated that she was feeling better and only complained of some leg pain and sensory issues along the right calf and foot. Dr. Lycette instructed her to begin physical therapy and to follow up with him in six weeks. At her next appointment on March 21, 2011, Plaintiff reported overall improvement with her back and leg pain and stated that she was working to wean herself off of pain medication. Dr. Lycette's physical examination showed no evidence of sensory loss. Plaintiff was in no acute distress and had a normal gait and normal strength in her upper and lower extremities. Dr. Lycette opined that she had recuperated well from her surgery. He again advised her to start physical therapy and invited her to return if she had any questions, concerns, or new symptoms. There is no evidence that

Plaintiff returned to Dr. Lycette with any concerns or new symptoms.  Moreover, Plaintiff testified that she had opted to discontinue physical therapy.

In determining Plaitniff's RFC, the ALJ also considered, but ultimately rejected, the opinions of the consultative examiners.  Finding that the medical record as a whole indicated that Plaintiff could only perform sedentary work, the ALJ rejected Dr. Kamenar's opinion that she was capable of performing light work.  The ALJ likewise disregarded the opinion of Dr. Blouse because it was inconsistent with the medical record.  Dr. Blouse's opined, in pertinent part, that Plaintiff could neither sit nor stand for more than one hour cumulatively in an eight hour work day.  Pursuant to this assessment, Plaintiff would be unable to sustain substantial gainful activity.  The ALJ properly gave little weight to Dr. Blouse's opinion because it was contradictory to her own findings and the balance of the medical evidence.  Upon examination, Dr. Blouse found no significant gait or station issues, ambulation deficits, or transfer problems, yet concluded that Plaintiff had extensive limitations.  Significantly, Dr. Blouse's conclusion was also inconsistent with Plaintiff's treating surgeon's finding that Plaintiff had recuperated well from her surgery and was ready to start physical therapy.  Indeed, Plaintiff had reported to Dr. Lycette that her surgery had resulted in overall improvement with her back and leg pain.  Because Dr. Blouse's opinion that Plaintiff had severe limitations was not supported by the evidence of record, the ALJ properly refused to give it controlling weight.

**IV.    Conclusion**

For the reasons set forth above, the court finds that the ALJ appropriately weighed the medical opinions and evidence and properly assessed

Plaintiff's RFC.  Accordingly, the court will affirm the decision of the Commissioner as supported by the record.

      An appropriate order will issue.

                                                    s/Sylvia H. Rambo
                                                    United States District Judge

Dated:  August 20, 2014.